IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 17, 2017

**GREGORY L. MATHIS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2009-B-1806      Steve R. Dozier, Judge**

**No. M2016-02516-CCA-R3-PC**

The Petitioner, Gregory L. Mathis, appeals the Davidson County Criminal Court's denial of his petition for post-conviction relief from his 2010 convictions for aggravated robbery, aggravated burglary, and two counts of especially aggravated kidnapping and his effective 126-year sentence. The Petitioner contends that (1) he received the ineffective assistance of counsel, (2) his especially aggravated kidnapping convictions violate principles of due process, and (3) he is entitled to a new trial based upon codefendant Turner's testimony at the post-conviction hearing. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and TIMOTHY L. EASTER, JJ. joined.

Chadwick Wyatt Jackson, Nashville, Tennessee, for the appellant, Gregory L. Mathis.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Glenn Funk, District Attorney General; and J. Wesley King, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arises from the burglary of Terry Beckner and Lisa Lewis's home in February 2009. The Petitioner and three codefendants, Elza Evans III, Emily Turner, and Danny Lee Sams, were indicted for aggravated robbery, aggravated burglary, and two counts of especially aggravated kidnapping. The trial court granted codefendant Sams's motion to sever his case, and he later pleaded guilty and testified at the joint trial of the Defendant and the remaining codefendants. The Defendant, codefendant Evans, and codefendant Turner were convicted as charged. The Defendant and codefendant Evans appealed their

convictions, and this court affirmed the convictions and summarized the facts of the case as follows:

Terry Becker testified at trial that in 2009 he was renting a small two-bedroom house with his fiancée, Lisa Lewis, in Nashville. On the night of February 25, 2009, co-defendant Emily Turner, a friend of Ms. Lewis, and co-defendant Danny Lee Sams, Turner's boyfriend, came to his house. Mr. Becker testified that Turner and Sams had visited the house in the past and that Turner would occasionally spend the night in his guest bedroom. Mr. Becker also testified that he had previously loaned Turner and Sams money and that he had helped Sams secure various odd jobs. According to Mr. Becker, Turner and Sams got into an "argument" while they were at his house. Mr. Becker testified that Sams told him that Turner was "driving [him] crazy or something to that effect." Sams then "stormed out and took [Turner's] car," stranding her at Mr. Becker's house.

Mr. Becker testified that co-defendant Turner rejected several offers he made to help her retrieve the car. Instead, Turner stayed in his guest bedroom and was up late "visiting" with Ms. Lewis. Mr. Becker testified that he went to bed "late in the evening" and that Ms. Lewis eventually joined him later that night. The next morning, Mr. Becker awoke at approximately 7:45 a.m. Mr. Becker testified that he saw Turner standing in the doorway of the guest bedroom. Mr. Becker asked Turner if she had let the dogs out, and she replied that she was about to. Mr. Becker then went to his kitchen to make some coffee. As Mr. Becker was making his coffee he saw two African-American men standing in his living room. Both men were dressed in "dark colored" clothes, had bandanas over their faces, wore sunglasses, and had plastic gloves on their hands. Both men were also wearing baseball caps and had the hoods from their sweatshirts up. Both men had guns and pointed them at Mr. Becker.

Mr. Becker testified that one of the men told him to get "all of the way down" on the ground. Mr. Becker complied, and the men duct taped his hands behind his back. The men then moved Mr. Becker to a dining room chair where they "strapped [him] to the chair around [his] chest and [his] upper arms" with duct tape. The men also taped Mr. Becker's arms to the chair. After Mr. Becker was taped to the chair, one of the men brought codefendant Turner into the room and had her lie down on the floor. Mr. Becker testified that one of the men then went into the bedroom, woke Ms. Lewis up, brought her into the dining room, and had her lie down next to Turner. According to

Mr. Becker, one of the men said, "Lisa we've been looking for you for a long time." The man said that Ms. Lewis "owed them $18,000." The man also nudged Turner with his foot several times and repeatedly said, "We don't know who this b---h is," to the point that Mr. Becker thought that they were overemphasizing it.

The men made Ms. Lewis kneel down in front of Mr. Becker, and one of them asked Ms. Lewis if she loved Mr. Becker. When Ms. Lewis stated that she did, the man said that Mr. Becker would write two checks for $9,000, one made out to Ms. Lewis and one made out to co-defendant Turner, and that the women would cash the checks and return with the money in thirty minutes or they would kill Mr. Becker. While the man was explaining the plan he had a gun pointed at Ms. Lewis, and the other man pointed his gun at Mr. Becker. One of the men got Mr. Becker's checkbooks and brought it back to the dining room. The men freed one of Mr. Becker's hands, and Mr. Becker wrote the checks as instructed. Sometime after the women left, the branch manager from a nearby Regions Bank called Mr. Becker. Mr. Becker testified one of the men put a gun to his head and leaned in so he could overhear the conversation. The branch manager told Mr. Becker that he was calling to verify that he had written the checks, and Mr. Becker told the branch manager to cash the checks.

A short time after the phone call from the bank manager, one of the men left the room to answer a cell phone call. When the man came back into the room he said that the police were at the bank, that they needed to leave, and told the other man to "take care" of Mr. Becker. The other man gagged Mr. Becker and bound him with more duct tape. The men broke Mr. Becker's cell phone, took the battery out of his home phone, and then fled the house. After they left, Mr. Becker was able to free himself. Mr. Becker testified that the skin on his arms was torn and bleeding from the duct tape. Mr. Becker also testified that at least one of the men stayed with him at all times during the ordeal and that the men kept their guns out the entire time they were there. Mr. Becker recalled that one of the men did most of the talking and that the other man stayed with him the majority of the time. Mr. Becker later inspected the house and found no evidence of forced entry.

Ms. Lewis testified at trial that on the night of February 25, 2009, co-defendants Turner and Sams came over to the house she shared with Mr. Becker. Ms. Lewis recalled that Turner and Sams got into an argument that night and Sams left in Turner's car. Ms. Lewis testified that she thought

-3-

Sams's taking the car "was very unusual" because she had "never known [Sams] to leave [Turner] without her car because it was her car, not theirs." Ms. Lewis also testified that Turner showed no interest in finding Sams or getting her car back that night. Instead, Turner and Ms. Lewis stayed up late taking drugs and "talking all night." Ms. Lewis admitted to taking Percocet while Turner used cocaine. At some point during the night, Turner told Ms. Lewis to go to bed with Mr. Becker because it would "look more suspicious" if she stayed in the guest bedroom. Ms. Lewis testified that she got into bed with Mr. Becker around 4:00 a.m.

Ms. Lewis testified that when she woke up the next morning there was a man with a bandana and a "hoodie on" standing over her and pointing a gun at her. The man motioned for her to get up and took her into the dining room where Ms. Lewis saw Mr. Becker, co-defendant Turner, and another masked man holding a gun. Ms. Lewis testified that one of the men told her to get down on the ground and then repeatedly said that they had "been looking everywhere for [her]." The man said that Ms. Lewis owed them money and that they were "going to get it." Ms. Lewis testified that the man then had her get up and go kneel down in front of Mr. Becker. The man put a gun to her head and asked her if she loved Mr. Becker. When she said yes, the man said that if she loved Mr. Becker she would do what they told her to. The men then had Ms. Lewis lie back down on the ground while Mr. Becker wrote two checks.

Ms. Lewis testified that one of the men said that she and co-defendant Turner would go to the bank and cash the checks for them. Ms. Lewis recalled that the man referred to Turner as "whoever this b---h is" and emphasized that he did not know Turner. Ms. Lewis also recalled that neither one of the men ever said her last name and that they checked her driver's license to make sure Mr. Becker had written the check to the right person. One of the men took her to the bedroom, so she could put on a sweatshirt. Ms. Lewis testified that the man kept a gun pointed at her the entire time. While they were in the bedroom, Ms. Lewis asked if she could get some cigarettes out of the night stand. When she opened the drawer, the man saw $300 in cash and a debit card. The man took the money and the debit card and demanded that Ms. Lewis give him the PIN for the account, which Ms. Lewis did. The men told her to come back in thirty minutes with the money or they would kill Mr. Becker.

-4-

Ms. Lewis testified that co-defendant Turner drove to the bank. According to Ms. Lewis, Turner repeatedly said that she wanted to stop somewhere and call co-defendant Sams. At some point while they were driving to the bank, Turner told Ms. Lewis, "[T]hey know you're wanted, they don't think you'll call the police." Ms. Lewis testified that when they arrived at the bank she "came unglued" and explained to a bank employee what was happening. The employee had Ms. Lewis call the police on his cell phone while the bank manager called Mr. Becker to "buy him a little bit of time." Ms. Lewis recalled that Turner continued to talk about how she needed to call Sams. The bank employees who helped Ms. Lewis testified at trial that she was "hysterical" while Turner was "real calm" and "distant." While they were at the bank, Turner pulled out her cell phone and made a phone call. Turner told the person she called that she was not at Mr. Becker's house, that she was at the bank, and whoever was going to pick her up should not go to Mr. Becker's house.

Ms. Lewis admitted that when she called the police and initially spoke with the responding officers she used a fake name. Ms. Lewis explained that, at the time, she had a drug problem and an outstanding warrant for a probation violation. Ms. Lewis testified that she was afraid of being arrested by the police. Ms. Lewis was arrested later that day after the police had completed their investigation into the robbery. Ms. Lewis testified that she gave the check made out to her to the police when they arrived. However, the police could not locate the check made out to co-defendant Turner. The bank employee who assisted Ms. Lewis testified that he had seen two checks both made out for $9,000 when the women arrived at the bank. Turner told the police that she had given the check to Ms. Lewis, but Ms. Lewis testified that she did not remember Turner ever giving her the check. The detective who responded to the bank testified that Turner told him her check "must've gotten blown away in the wind."

Based upon Ms. Lewis's 911 call, officers from the Metropolitan Nashville Police Department surrounded Mr. Becker's house. Officers observed two men dressed in "all black, dark clothing" exit the house and begin hurriedly walking away from the house. When an officer approached the men they began running in opposite directions. Officers subdued both men. Defendants Mathis and Evans were identified at trial as the two men caught fleeing from Mr. Becker's house. Officers saw the Defendants "dropping stuff" as they ran and collected trails of evidence from each of the Defendants leading back toward Mr. Becker's house.

On the ground where Defendant Evans had been running, police found a wig, a black baseball cap, a cigarette lighter, a cell phone, and a .380 caliber pistol. Defendant Evans had "long black" wig hairs on his neck and head. A search of Defendant Evans revealed a roll of duct tape, a black bandanna, and a cell phone. On the ground where Defendant Mathis had been running, police found a cell phone, a black baseball cap, a wig, a pair of sunglasses, three plastic gloves, and Mr. Becker's debit card. An officer saw Defendant Mathis throw a gun over a fence into a neighbor's yard and a .9mm pistol was later recovered from the neighbor's yard. Both of the recovered guns were fully loaded and ready to fire. When Defendant Mathis was stopped, he had on plastic gloves with pieces of duct tape stuck to them and a hairnet for a wig on his head. A search of Defendant Mathis revealed a bandanna, the key to a Jeep Cherokee, and $341 in cash.

A Jeep Cherokee was found a block away from Mr. Becker's house. Fingerprints belonging to Defendant Mathis and co-defendant Turner were found on the outside of the vehicle. Inside the vehicle was a receipt for the purchase of two pairs of sunglasses, two bandanas, and a "hoodie," timestamped at 3:09 a.m. on February 26, 2009. Inside Mr. Becker's house, a piece of duct tape with part of a plastic glove attached to it was recovered from a chair in the dining room. No fingerprints were recovered from inside Mr. Becker's house. Mr. Becker testified that after the police searched his house, Turner was brought there and eventually picked up by co-defendant Sams. Later that day, Mr. Becker discovered two checks were missing from his checkbook. Mr. Becker received a phone call from a nearby bank informing him that a woman was attempting to cash one of the checks made out for $3,500. Turner and Sams were arrested at the bank with Mr. Becker's missing checks.

Co-defendant Sams testified that he had pled guilty in this case and was awaiting sentencing. Sams testified that at the time of the robbery he was dating co-defendant Turner. According to Sams, Turner came up with the idea to rob Mr. Becker, and he helped her plan the robbery. Sams testified that Turner introduced him to Defendant Mathis and that they approached him about helping them with the robbery because they knew he had a gun. Defendant Mathis agreed to help them, but he said "that he wanted to do it his way; that he had a friend from his hometown that he could trust." They agreed that they would force Mr. Becker to write two checks totaling $18,000 and that they would split the money three ways: Sams and Turner would get $6,000;

Defendant Mathis would get $6,000; and Defendant Mathis's "partner" would get $6,000.

Co-defendant Sams testified that the plan was for co-defendant Turner to stay the night at Mr. Becker's house and leave the backdoor unlocked. Sams also testified that he drove by Mr. Becker's house with Defendant Mathis so he could get an idea of how he would enter the house. According to Sams, on the night of February 25, 2009, he pretended to have an argument with Turner so she could stay the night at Mr. Becker's house. Sams testified that Turner later called him and told him that Mr. Becker and Ms. Lewis had believed them. The next day Turner called him from the bank to tell him that the police were on their way and not to go to Mr. Becker's house. Sams testified that he called Defendant Mathis and told him to get out of the house because the police were on their way. Sams claimed that he did not know Defendant Evans and that Defendant Evans was not involved in the planning of the robbery.

*State v. Gregory Mathis and Elza Evans*, No. M2011-01096-CCA-R3-CD, 2013 WL 4774130, at *1-5 (Tenn. Crim. App. Sept. 5, 2013), *perm. app. denied* (Tenn. Dec. 12, 2013).

On October 3, 2014, the Petitioner filed a petition for post-conviction relief, alleging the ineffective assistance of counsel and violations of his due process rights.

At the post-conviction hearing, the Petitioner testified that trial counsel failed to investigate adequately in order to establish that Lisa Lewis was an accomplice or involved in a conspiracy and that establishing Ms. Lewis was not a victim would have impacted the verdict of the especially aggravated kidnapping charge related to Ms. Lewis. The Petitioner said that before the incident, codefendant Turner told Ms. Lewis to go to sleep on the night of the offense because it might have raised suspicion if Ms. Lewis were not in the "proper room she's supposed to be in with" Terry Becker. The Petitioner said that he and codefendant Turner talked "briefly about Ms. Lewis being in on it" but that he did not speak directly to Ms. Lewis about the robbery. He stated that about one or two weeks before the robbery, he and codefendant Turner discussed Ms. Lewis and that he understood codefendant Turner "had some sort of side deal with Ms. Lewis to be in on the robbery." The Petitioner said Ms. Lewis was to receive a portion of the robbery proceeds. He admitted, though, he did not discuss this with trial counsel.

The Petitioner testified that the information related to Ms. Lewis would have been presented to the jury had trial counsel called him to testify on his own behalf. The Petitioner said that at the last moment, counsel "talked [him] out of testifying." He said his testifying that Ms. Lewis was a co-conspirator was his best defense to the especially aggravated

kidnapping charge related to Ms. Lewis. He noted that at the time of his trial, the *White* instruction did not exist relative to whether a kidnapping is merely incidental to accomplishing a robbery. *See State v. White*, 362 S.W.3d 559 (Tenn. 2012) (determining that due process requires a trial court to provide a jury instruction asking jurors to determine whether a victim's removal or confinement is essentially incidental to the accompanying felony offense of aggravated robbery before convictions for kidnapping and aggravated robbery are permitted). The Petitioner thought the jury needed to hear his testimony. He said that he and counsel discussed before the trial the Petitioner's testifying but that at the trial, he and counsel stepped out of the courtroom to discuss it. The Petitioner said that counsel noted the prosecutor would question him about his criminal history. The Petitioner said that he did not understand what counsel was saying, that he thought counsel "had something to appeal," and that it would "be okay." The Petitioner said he would have told the jury that this case was about a "scam . . . to get the checks cashed and to get the money." The Petitioner said that once he was inside the home, he asked codefendant Turner if Ms. Lewis was "still in on it" and that codefendant Turner nodded her head. He said that when he and Ms. Lewis were inside the bedroom, Ms. Lewis gave him the money and the debit card pin number. He said that Ms. Lewis "folded" when she and codefendant Turner arrived at the bank.

The Petitioner testified that the kidnapping was merely incidental to the robbery and that the offense was truly an attempted robbery because the checks were not "turned into money." He said that codefendant Turner and Ms. Lewis took the "completed checks" to the bank while Mr. Becker was being held at the home during the ongoing theft. The Petitioner argued that all of his convictions were incidental to each other and that neither offense "rose to the degree that it was completed." The Petitioner stated that the supreme court's opinion in *White* was released while the appeal of his convictions was pending before this court.

The Petitioner testified that he would have testified at the trial that codefendant Evans did not have a weapon during the incident and that the Petitioner "forced" codefendant Evans inside the home. The Petitioner agreed he would have told the jury that he possessed the gun and said it was "for the jury to decide." He said he would have admitted that he attempted to commit a robbery but denied that he committed a kidnapping. He acknowledged that his credibility would have been questioned based upon his previous criminal convictions. The Petitioner said that he wanted to testify and that he ultimately decided not to testify because trial counsel "talked [him] out of it."

On cross-examination, the Petitioner testified that trial counsel represented him for about one and one-half years before the trial, that they talked about the case during their meetings, and that counsel did not know that Ms. Lewis was involved in the offenses. The Petitioner agreed that he had ample opportunity to tell counsel about Ms. Lewis's involvement but said he did not know at the time of the trial that this information was

important to his defense. The Petitioner agreed counsel discussed the seriousness of the offenses and the extensive prison sentence he could receive if convicted after a trial.

The Petitioner testified that he had known codefendants Sams and Turner since 2008, which was about one year before the offenses. The Petitioner said he had known codefendant Evans since the Petitioner was age fifteen but denied they had committed any previous crimes together. The Petitioner said that codefendants Sams and Turner approached him with robbing Mr. Becker but that codefendant Turner had a "side deal" about which codefendant Sams did not know. The Petitioner said that codefendants Sams and Turner did not know codefendant Evans and that Ms. Lewis could not have known codefendant Evans.

The Petitioner testified that on the night of the offenses, codefendant Turner and Ms. Lewis were at Mr. Becker's home and that codefendant Evans and the Petitioner drove to the home later. The Petitioner agreed he purchased wigs and duct tape before the home invasion. He said that when he and codefendant Evans reached the back door of Mr. Becker's home, the Petitioner pulled out one gun, although he had another gun. The Petitioner said that he told codefendant Evans about the home invasion when they arrived at Mr. Becker's home and that codefendant Evans did not want to participate and did not have a gun. The Petitioner said Mr. Becker's trial testimony was incorrect that two black men entered the home with guns. The Petitioner said he did not tell trial counsel that he forced codefendant Evans to participate in the incident. The Petitioner agreed he did not tell counsel that Ms. Lewis "had a side deal" with codefendant Turner.

The Petitioner testified that he did know before the incident that Mr. Becker was an older gentleman and that the Petitioner ensured Mr. Becker remained calm and took his medications during the incident, although the Petitioner pointed a gun at and placed duct tape around Mr. Becker. The Petitioner agreed he had three previous convictions for aggravated robbery relative to a single incident involving three victims and a conviction for unlawful possession of a firearm.

The Petitioner testified that he and codefendant Evans were inside Mr. Becker's home for a significant amount of time. The Petitioner agreed that he entered the home, that he bound Mr. Becker, that he and codefendant Evans remained at the home while codefendant Turner and Ms. Lewis drove to the bank, and that he and codefendant Evans left the home after codefendant Sams called to report the police were responding to Mr. Becker's home. The Petitioner said that he returned to the home to apologize to Mr. Becker and that the police arrived when he was inside the home. The Petitioner denied hearing codefendant Evans yell to the police that "they" held codefendant Evans at gunpoint and made

codefendant Evans participate. The Petitioner did not know codefendant Evans confessed to the police.

The Petitioner testified that he discussed his decision to testify at the trial with codefendant Evans and that the Petitioner made a last-minute decision at the trial not to testify. The Petitioner agreed that codefendant Evans could have run from Mr. Becker's home.

Codefendant Emily Turner testified that Ms. Lewis participated in the plan from the beginning. Codefendant Turner testified that she and Ms. Lewis planned the robbery together, that Ms. Lewis wanted a portion of the proceeds, and that Ms. Lewis provided her with a check and left the door unlocked to the home. Codefendant Turner said that without Ms. Lewis's involvement, codefendant Turner would not have known the amount of money in Mr. Becker's financial account. Codefendant Turner said she told the Petitioner and codefendant Sams about Ms. Lewis's involvement. Codefendant Turner recalled telling the Petitioner about Ms. Lewis's participation when they met at a restaurant.

Codefendant Turner testified that on the night of the robbery, she and Ms. Lewis were at Mr. Becker's home "getting high together." Codefendant Turner said that two people came to the home unexpectedly and that Ms. Lewis told them they had to leave. Codefendant Turner said that the plan was for Ms. Lewis to tell Mr. Becker that she owed "these people" money. Codefendant Turner said that Ms. Lewis's primary concern was an outstanding arrest warrant. Codefendant Turner said that Ms. Lewis unlocked the back door for the Petitioner. Codefendant Turner recalled that after the robbery and "they were in custody," Ms. Lewis obtained a third check from Mr. Becker's financial account, that Ms. Lewis told codefendant Turner to cash the check, and that Ms. Lewis stated she would speak to the bank if she received a telephone call. Codefendant Turner said that she took this check to the bank to cash it. Codefendant Turner said that Ms. Lewis was to receive one-half of codefendant Turner's portion of the proceeds.

On cross-examination, codefendant Turner testified that the initial planning involved codefendant Turner, codefendant Sams, and Ms. Lewis. She agreed, though, that she discussed the plan with the Petitioner at least twice. When the trial court stated it was odd she did not tell anyone Ms. Lewis was involved in the robbery, codefendant Turner stated that her attorney told her it would not do any good to question Ms. Lewis at the trial. Codefendant Turner admitted her guilt in the robbery but denied having a friendship with the Petitioner. She said the Petitioner wrote her one letter and that they discussed this case at the courthouse before the post-conviction hearing began. She agreed she had previous convictions for theft, burglary, forgery, and criminal simulation. Codefendant Turner said

that codefendant Evans was not involved in the planning process and that she had never seen him before the night of the robbery.

Codefendant Evans testified, in relevant part, that he did not know anything about the robbery before it occurred, that he told his attorney that the Petitioner was willing to sign an affidavit, and that his attorney did not speak with the Petitioner or the Petitioner's attorney.

On cross-examination, codefendant Evans testified that he and the Petitioner had been friends since childhood, that they remained friends after the robbery, and that the Petitioner felt "bad" codefendant Evans was convicted in this case. He said that the Petitioner pulled out a gun and said they were entering Mr. Becker's home, that codefendant Evans did not want to enter the home, and that the Petitioner told codefendant Evans that he did not have a choice. Codefendant Evans denied having a gun during the incident and said he only "stood there" inside the home. He said he gave Mr. Becker medication and made Mr. Becker a cup of coffee. Codefendant Evans agreed, though, that he told the police that he held a gun during the incident and threw it down, along with the bandana and wig he wore.

The Petitioner's trial counsel testified that he had devoted his twelve-year career to criminal defense and that at the time of the Petitioner's trial, counsel had tried five to ten jury cases. He said that he prepared for the Petitioner's trial by reviewing the discovery material, which included the Petitioner's lengthy police statement. Counsel noted that he filed a motion to suppress the Petitioner's statement, that the trial court denied the motion, and that the State decided not to use the statement at the trial. Counsel said that he reviewed the photographs and ballistic evidence collected at the scene and that he and the Petitioner reviewed all of the discovery materials. Counsel said that he also prepared for his opening statement, jury selection, and witness examinations.

Trial counsel testified that he attempted to create a theory of the case but that the facts of the case were "bad" for the Petitioner. Counsel said he had difficulty determining a theory that would have exculpated the Petitioner from the criminal charges. Counsel said the most favorable argument the defense had at the time of the trial was its reliance on *State v. Anthony*, 817 S.W.2d 299 (Tenn. 1991), and *State v. White*, 362 S.W.3d 559 (Tenn. 2012), the latter of which was pending before the supreme court at the time of the trial, to support the argument that the aggravated kidnapping charges were merely incidental to the aggravated robbery. Counsel doubted, however, that the argument would result in a favorable outcome because the Petitioner was inside the home for thirty to sixty minutes while the women went to the bank. Counsel said that he made a motion for a judgment of acquittal on the basis that the kidnappings were incidental to the robbery and that the motion was denied. Counsel noted that Ms. Lewis's conduct led the police to the home before the Petitioner and codefendant Evans left the home. Counsel noted that the Petitioner was

caught by the police when the Petitioner fled the home and that misidentification was not an issue in this case. Counsel said his goal was to minimize the Petitioner's involvement and to reduce the number of offenses for which the Petitioner would be convicted because the jury verdicts would be unfavorable to the Petitioner.

Trial counsel testified that at the motion for a new trial hearing, he argued that pursuant to *Anthony* and *White*, the evidence was insufficient to support the kidnapping convictions because the especially aggravated kidnappings were only to accomplish the aggravated robbery. Counsel said that his argument was legal in nature and that as a result, he did not present his argument to the jury. Counsel said that he raised the issue in the appeal of the convictions and that this court denied relief.

Trial counsel testified that he met with the Petitioner five to ten times, that they reviewed the evidence, that counsel provided his view of the evidence, and that counsel discussed the possible sentences after the trial. Counsel said the Petitioner had the opportunity to discuss any concerns about the case. Counsel said that he attempted to negotiate a plea agreement by suggesting twenty to twenty-five years at 100% service but that the prosecutor was not receptive and never extended a plea offer.

Trial counsel testified that he and the Petitioner discussed the Petitioner's testifying at the trial. Counsel said he advised the Petitioner that the State would impeach the Petitioner with his previous convictions, which included robbery, and that the Petitioner's testimony would not help his case. Counsel noted that the Petitioner's testimony would have been an admission of guilt to the aggravated robbery and that counsel was unsure whether the Petitioner's testimony would have helped codefendant Evans. Counsel said the Petitioner had expressed before the trial that codefendant Evans did not know what was going to happen and that the Petitioner felt a sense of duty to help codefendant Evans. Counsel said, though, that the Petitioner's post-conviction hearing testimony was the first reference to codefendant Evans participating in the incident under duress, based upon the Petitioner's displaying a firearm. Counsel agreed that he discouraged the Petitioner from testifying and that his opinion had not changed and said that it was ultimately the Petitioner's decision whether to testify. Counsel said that although he was "forceful" with his opinion, he thought the Petitioner understood the Petitioner could testify regardless of counsel's advice.

Trial counsel testified that he and the Petitioner discussed codefendant Evans's role long before the trial began and that the Petitioner had ample opportunity to discuss the Petitioner's pointing a gun at codefendant Evans. Counsel said knowing the information could have been useful in preventing a surprise at the trial but that the information did not change his opinion about whether the Petitioner should have testified at the trial because the

Petitioner would have admitted he committed additional crimes by telling the jury that he pointed a gun at codefendant Evans.

Trial counsel testified that his initial reaction to the Petitioner's stating that Ms. Lewis was complicit in the robbery was that counsel had never heard it before the post-conviction hearing. He said, though, it was possible someone had raised the accusation previously but could not recall whom. Counsel said it could have been codefendant Turner or codefendant Sams. Counsel said, though, the Petitioner never told him that Ms. Lewis was a co-conspirator. Counsel said that based upon the discovery material, counsel concluded that Ms. Lewis was an "easy victim." Counsel said that any information Ms. Lewis was not a victim would have been helpful to impeaching Ms. Lewis's credibility. Counsel noted, though, that such evidence would not have exonerated or exculpated the Petitioner relative to the aggravated robbery and aggravated burglary charges because knowledge that Ms. Lewis was an alleged co-conspirator would have shown the Petitioner was also a participant of a conspiracy. Counsel said that the Petitioner never stated Ms. Lewis was a co-conspirator before or after the trial, including during the appellate process.

On cross-examination, trial counsel testified relative to Ms. Lewis's alleged involvement in the offenses that the Petitioner did not tell him about Ms. Lewis and that he heard "some kind of rumor out there that she might have been involved." Counsel said that the trial court denied his motion for a judgment of acquittal relative to the especially aggravated kidnapping charges and that as a result, he did not request a jury instruction to define for the jury what "would have been incidental to a robbery and what would have been kidnapping in its own right." He said, though, the *White* issue was litigated in the appeal of the convictions.

Trial counsel testified that during the trial, he and the Petitioner discussed whether the Petitioner would testify. Counsel said that he vaguely recalled the conversation, that the Petitioner had expressed a desire to "clear the air" about codefendant Evans's involvement, and that counsel consistently told the Petitioner, before and during the trial, that counsel strongly advised the Petitioner not to testify. Counsel said the Petitioner made the decision not to testify. Counsel said that the Petitioner primarily wanted to testify in order to establish that codefendant Evans was not involved in the planning stage and that as a result, the Petitioner thought codefendant Evans was less culpable. Counsel said that he attempted to explain to the Petitioner that such testimony did not help the Petitioner's case. Counsel said that the Petitioner never stated that he forced codefendant Evans into the home.

The post-conviction court denied relief after determining that counsel did not render deficient performance and that the Petitioner failed to establish that any deficiency resulted in prejudice. Relative to the Petitioner's allegation that trial counsel provided ineffective

assistance by failing to investigate whether Ms. Lewis was a co-conspirator, the court credited counsel's testimony over that of the Petitioner's testimony. The court found that the Petitioner never told counsel about Ms. Lewis's involvement, that counsel understood Ms. Lewis was a victim, and that the Petitioner stated nothing to lead counsel to a different conclusion. The court found that counsel had no information showing Ms. Lewis was an accomplice before or during the trial and that counsel would have "discredited" her at the trial had he had information showing she was a criminal actor.

The post-conviction court credited trial counsel's testimony that counsel and the Petitioner discussed whether the Petitioner should testify at the trial. The court found that counsel discussed the likelihood the Petitioner's previous criminal convictions would be used for impeachment purposes and that counsel advised testifying would not be beneficial to the Petitioner. The court determined that counsel was certain the Petitioner understood the decision whether to testify belonged to the Petitioner. The court found that the State presented overwhelming evidence of the Petitioner's guilt at the trial.

The post-conviction court found that although trial counsel did not include the final jury instructions in the appellate record in the appeal of the Petitioner's convictions, this court considered on the merits whether the especially aggravated kidnappings of Mr. Becker and Ms. Lewis were merely incidental to accomplishing the aggravated robbery. The court found that the Petitioner's trial was held before the supreme court's opinion in *White* was released but noted that *White* and the appeal of the Petitioner's convictions were pending simultaneously. The post-conviction court also noted this court determined that the confinement of the victims went beyond that necessary to accomplish the robbery and that the outcome of the trial would have been the same had the *White* instruction been provided to the jury. This appeal followed.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id*. § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

## I. Ineffective Assistance of Counsel

-14-

The Petitioner contends that counsel provided ineffective assistance. The Petitioner argues that counsel failed to investigate whether Ms. Lewis was a co-conspirator to the offenses, that counsel imposed his will relative to the Petitioner's testifying at the trial, and that counsel failed to argue to the jury during closing arguments that the especially aggravated kidnappings were essentially incidental to accomplishing the aggravated robbery. The State responds that the Petitioner failed to establish that counsel was ineffective. We agree with the State.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. S*ee State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

Relative to trial counsel's investigation regarding Ms. Lewis's alleged involvement in the robbery, the record reflects that trial counsel and the Petitioner discussed this case on five to ten occasions. Counsel sought to suppress the Petitioner's police statement and reviewed the discovery materials, photographs, and ballistic evidence with the Petitioner. Counsel's

credited testimony shows that the Petitioner never told counsel that Ms. Lewis was a co-conspirator to the aggravated robbery, and the Petitioner admitted at the post-conviction hearing that he never mentioned it to counsel. Counsel said he would have used this information to impeach Ms. Lewis's credibility at the trial. We note, though, that Ms. Lewis alerted bank personnel to the robbery and that counsel determined, based upon the discovery materials, Ms. Lewis was a victim. Counsel provided the Petitioner with counsel's view of the evidence and the possible sentence after a trial. Although the Petitioner had ample opportunity to tell counsel about Ms. Lewis's alleged involvement, the Petitioner remained silent about this allegation. In any event, even if counsel had information that Ms. Lewis was a co-conspirator to the robbery, such evidence would not have exonerated or exculpated the Petitioner from the aggravated robbery, aggravated burglary, and especially aggravated kidnapping charge relative to Mr. Becker. The record supports the post-conviction court's determinations that the Petitioner failed to show that counsel provided deficient performance on this issue and that any deficiency resulted in prejudice to the Petitioner.

Relative to the Petitioner's testifying at the trial, the record reflects that trial counsel and the Petitioner discussed before and during the trial the benefits and pitfalls of testifying. Counsel advised the Petitioner that the State would impeach the Petitioner with his previous convictions, which included robbery, and that the Petitioner's testimony would not benefit the Petitioner's case. Counsel properly advised the Petitioner that if the Petitioner testified that codefendant Evans did not know about the aggravated robbery before it occurred, such testimony would not have benefited the Petitioner's case. The Petitioner stated at the post-conviction hearing that he would have admitted at the trial that he committed the aggravated robbery but that he would have denied the especially aggravated kidnapping charges. Furthermore, although the Petitioner never told counsel that he forced codefendant Evans into Mr. Becker's home, had the Petitioner testified to this circumstance at the trial, the Petitioner would have admitted he committed additional criminal offenses. Counsel discouraged the Petitioner from testifying at the trial, and counsel said the Petitioner understood the decision belonged to the Petitioner. Counsel and the Petitioner left the courtroom to discuss this matter during the trial, and the Petitioner admitted during the post-conviction hearing that the Petitioner made a last-minute decision not to testify. The record supports that post-conviction court's determinations that the Petitioner failed to show that counsel provided deficient performance on this issue and that any deficiency resulted in prejudice to the Petitioner.

Last, the Petitioner argues that counsel's failure to argue that the especially aggravated kidnapping of Mr. Becker was essentially incidental to the aggravated robbery was ineffective assistance, even though this court determined in the appeal of the Petitioner's convictions that the confinement of Mr. Becker went beyond that necessary to accomplish the aggravated robbery. The record reflects that trial counsel testified that after the State's

case-in-chief, he requested the court enter a directed verdict for the especially aggravated kidnapping charges on the basis that the kidnappings were essentially incidental to accomplishing the aggravated robbery. Counsel said that he made the motion knowing the trial court would deny it because the Petitioner was inside Mr. Becker's home for thirty to sixty minutes while Ms. Lewis and codefendant Turner traveled to the bank. At the time of the Petitioner's trial, counsel knew the supreme court's opinion in *White* was forthcoming, and counsel said *White* provided the basis for the motion for a judgment of acquittal and for counsel's raising on appeal that the especially aggravated kidnapping offenses were essentially incidental to accomplishing the aggravated robbery.

In the Petitioner's previous appeal, trial counsel alleged that the especially aggravated kidnapping charges were essentially incidental to accomplishing the aggravated robbery and that due process principles required merger of the kidnapping convictions with the aggravated robbery conviction pursuant to *White*. *See State v. Mathis and Evans*, 2013 WL 4774130, at *7. This court concluded that although the trial court did not provide the *White* jury instruction, the aggravated robbery was completed when the Petitioner and his codefendants "took possession of Mr. Becker's money, debit card, and checks." *Id*. at *9. This court noted that the Petitioner's reliance on the checks' having no value until a bank converted them into cash was misplaced and determined that the two checks were each valued at $9,000. *Id*. This court determined that the Petitioner's sending Ms. Lewis and codefendant Turner to the bank to cash the checks constituted a separate criminal offense. *Id*. Furthermore, this court determined that the Petitioner's continuing to confine Mr. Becker occurred during this separate offense, not in furtherance of the aggravated robbery. *Id*. Relative to Ms. Lewis, this court concluded that the *White* instruction was unnecessary because the Petitioner and the codefendants were not charged with any robbery related to Ms. Lewis. *Id*. This court concluded beyond a reasonable doubt that the jury's verdicts would have been the same for each especially aggravated kidnapping charge had the *White* instruction been provided to the jury. *Id*. Therefore, the absence of the appropriate instruction relative to whether the especially aggravated kidnappings were essentially incidental to accomplishing the aggravated robbery was harmless error. *Id*. Because this court determined that the outcome of the trial would not have been different had the *White* instruction been provided the jury, the Petitioner is unable to establish that counsel provided deficient performance and that any deficiency resulted in prejudice to the Petitioner. The record supports the post-conviction court's determinations, and the Petitioner is not entitled to relief on this basis.

In reaching this conclusion, we have not overlooked the Petitioner's standalone, passing assertion in his appellate brief that his convictions for the aggravated robbery and especially aggravated kidnapping of Mr. Becker violate due process. As noted above, this court previously determined that both convictions are permissible because the especially

aggravated kidnapping was not essentially incidental to accomplishing the aggravated robbery and that due process does not require a new trial even in the absence of the *White* instruction. "A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing." T.C.A. § 40-30-106(g) (2012). The Petitioner is not entitled to relief on this basis.

## II. & III.   Due Process Violation & Newly Discovered Evidence

The Petitioner contends that his conviction for the especially aggravated kidnapping of Ms. Lewis violates due process principles because she was a co-conspirator to the aggravated robbery. He also contends that newly discovered evidence in the form of codefendant Turner's post-conviction testimony shows that Ms. Lewis was a co-conspirator in the aggravated robbery and that he is entitled to a new trial.

In the Petitioner's appellate brief, he identifies his due process contention as an issue raised on appeal. However, in the argument section of his brief, he asserts no argument or citation to the record and presents no legal authority to support his allegation. Tennessee Rule of Appellate Procedure 27(a)(7)(A) requires that an appellant's argument contain "citations to the authorities and appropriate references to the record . . . relied on." The rules of this court provide, "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived[.]" Tenn. Ct. Crim. App. R. 10(b). Appellate review of this issue is waived, and the Petitioner is not entitled to relief on this basis.

Our courts have previously concluded that "newly discovered evidence does not, alone, constitute a proper ground for post-conviction relief." *Lester Dale Herron v. State*, No. 03C01-9506-CR-00167, 1996 WL 134957, at \*3 (Tenn. Crim. App. Mar. 27, 1996), *perm. app. denied* (Tenn. July 8, 1996). Post-conviction proceedings involve constitutional issues, and in order for an allegation of newly discovered evidence to warrant post-conviction relief, a constitutional right must be implicated. *Id*. This court concluded that newly discovered evidence claims "generally, amount[] to no more than a request to relitigate the sufficiency of the evidence at trial, which a post-conviction proceeding may not be employed to do." *Id*. (internal quotation marks and citation omitted). Although challenges to sufficiency of the evidence may implicate due process principles pursuant to *Jackson v. Virginia*, 443 U.S. 309 (1979), "*Jackson* does not extend to nonrecord evidence, including newly discovered evidence." *Id*.; *see Herrera v. Collins*, 506 U.S. 390, 402 (1993). Therefore, the Petitioner has not stated a colorable claim for post-conviction relief.

We note, too, that the evidence at issue is not newly discovered evidence. The Petitioner admitted at the post-conviction hearing that he knew before the night of the offenses that Ms. Lewis was a co-conspirator or accomplice. An assertion of newly

discovered evidence cannot be based upon information known to the Petitioner at the time of the offense but not presented at the trial. *See* T.C.A. § 40-26-105(b) (2012). Furthermore, trial counsel did not present evidence related to Ms. Lewis's involvement because the Petitioner never told counsel that Ms. Lewis was a co-conspirator. Counsel determined from the discovery materials that Ms. Lewis was a victim, and counsel received no evidence suggesting otherwise.

Based upon the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE